## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**WENDELL KENT FREEMAN**

      **Plaintiff,**

    **v.**

**JONATHAN SPOLJARIC,** *et al.***,**

      **Defendants.**

**Case No. 1:22-cv-203**
**JUDGE DOUGLAS R. COLE**
**Magistrate Judge Litkovitz**

### OPINION AND ORDER

Defendants Jonathan Spoljaric and Lawrence County filed the instant Motion to Dismiss (Doc. 18) Plaintiff Wendell Kent Freeman's Amended Complaint (Doc. 11), and a separate Motion to Deem Requests for Admissions Admitted (Doc. 29). For the reasons below, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss (Doc. 18). Specifically, the Court **GRANTS** Defendants' Motion as to Freeman's due process property deprivation and medical care claims against Spoljaric in his individual capacity, all claims against Spoljaric in his official capacity, and all claims against Lawrence County. The Court **DISMISSES** those claims **WITHOUT PREJUDICE** and **DISMISSES** Lawrence County from this case. However, the Court **DENIES** Defendants' Motion as to Freeman's excessive use of force, unreasonable search, and First Amendment retaliation claims as against Spoljaric in his individual capacity. Those claims may proceed.

As for Defendants' other motion (Doc. 29), the Court **ORDERS** Freeman to **SHOW CAUSE** in writing no later than April 28, 2023, why, given his failure to

respond to Defendants' Requests for Admissions, the Court should not deem both sets of Requests for Admissions fully admitted. Alternatively, Freeman may respond to Defendants' Requests for Admissions and notify the Court he has done so no later than April 28, 2023. In either event, the Court hereby **NOTIFIES** Freeman that continued failure to respond to Defendants' discovery requests may result in sanctions up to and including dismissing his case with prejudice.

## BACKGROUND

The allegations thus far have been laid out in Freeman's Complaint (Doc. 1) and Amended Complaint (Doc. 11). In addition, Freeman has provided the Court with security camera footage detailing the events at issue. (Doc. 11, #76). As the Court is addressing a motion to dismiss under Rule 12(b)(6), the Court reports here as "facts" the allegations from Freeman's Complaints. The Court notes, though, that the video largely confirms many of those allegations.[1]

### A. Factual History

Freeman owns property in Lawrence County, Ohio. (*Id.* at #59). On that property sits Freeman's house, a separate "small outbuilding," and a firing range behind his house. (*Id.* at #61). Freeman once rented the outbuilding to Jennifer Woods for her personal use, but that rental term ended on January 15, 2022. (*Id.*). Freeman has installed surveillance cameras throughout his property. (*Id.*).

---

[1] "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto . . . so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

On January 22, 2022, Freeman alleges a neighbor told him that someone had seen Jennifer Woods's daughter, Sara Woods, break into Freeman's primary residence and take his belongings. (*Id.*). The neighbor further claimed to have seen Sara enter the outbuilding her mother, Jennifer, had occupied—presumably to steal items there as well. (*Id.*). Freeman dialed 911 to report a "burglary in progress." (*Id.* at #61–62).

Lawrence County Sheriff's Deputy Jonathan Spoljaric responded. (*Id.* at #62). From the face of the allegations, it is clear Freeman and Spoljaric have some history. After Freeman explained the situation, Spoljaric became agitated, telling Freeman, he was "getting tired of this shit! We've been here 10 times!" and claiming Freeman needed to file an eviction proceeding to remove Sara Woods. (*Id.*). (Based on Freeman's allegations, it is unclear whether Sara also previously resided on Freeman's property with her mother.) Freeman allegedly responded that Spoljaric knew from prior interactions that Sara "was a problem" and that she had been told she was no longer permitted on Freeman's property. (*Id.*). Spoljaric asked Freeman where Sara was and also asked for Jennifer's phone number. (*Id.*). Freeman replied that Sara "was down by the guardrail by the road" and gave Spoljaric Jennifer's phone number. (*Id.*). Freeman alleges Spoljaric then stated "I'm not taking your report" and left to speak with Freeman's neighbor and other "observers" of the incident by the road. (*Id.* at #62–63).

Freeman then began recording the interaction on his cell phone. (*Id.* at #63). While doing so, Freeman stated, "Here they go again. Refusing to take my report."

(*Id.*). Freeman claims to have recorded for about 15 seconds before re-entering his residence. (*Id.*). He then "waited for Spoljaric to leave his property." (*Id.*). It is unclear how long he waited.

At some point, Freeman claims he looked out the window and did not see Spoljaric or the "observers" in the street where they previously had been. (*Id.*). Presumably, he felt this meant Spoljaric had left. So Freeman proceeded out the back of his home to his firing range and fired approximately five rounds. (*Id.*). Freeman then walked around to the front of his house, at which time he noticed Spoljaric still in his driveway. (*Id.*). Freeman continued walking to his front door and heard Spoljaric yell something he could not understand. (*Id.*).

Freeman entered his home from the front door, closed the door, and placed his firearm on the kitchen table. (*Id.*). Freeman then re-opened his front door, stepped out his home, and yelled "What?" to Spoljaric. (*Id.* at #64). Spoljaric responded by "complain[ing] that [Freeman] discharged his firearm." (*Id.*). Freeman told Spoljaric he believed he was entitled to "fire his weapon on his own property," to which Spoljaric said, "That's not how it works." (*Id.*). Freeman responded, "How does it work?" (*Id.*).

At that point, Spoljaric approached Freeman while he stood just outside his open front door. (*Id.*). Freeman raised his hands into the air and "stepped backwards approximately 3 feet," crossing the threshold into his home. (*Id.*). Spoljaric ordered Freeman to exit, unholstering his pepper spray. (*Id.*). Freeman stood still. (*Id.*). With hands still raised, Freeman stated he had done nothing wrong. (*Id.*). Spoljaric

4

deployed his pepper spray across the threshold without stepping into Freeman's residence. (*Id.*).

His hands still raised upright, Freeman turned away from Spoljaric and "stumbled a few more feet" farther into his home. (*Id.*). Freeman asked why Spoljaric had sprayed him and repeated his claim he had done nothing wrong. (*Id.*). Spoljaric again demanded Freeman come outside. (*Id.*). When Freeman did not comply, Spoljaric stepped into Freeman's home and deployed his taser. (*Id.*). Freeman collapsed. (*Id.*). Freeman alleges Spoljaric "continued the intermittent taser electrocution [for] over a 30 second period of time." (*Id.*).

Following the taser deployment, Freeman claims Spoljaric then "punched him several times to his head and kneed [him] several times in the ribs and his back." (*Id.* at #64–65). During this time, Freeman asked "why do you keep doing this to me, sir," and Spoljaric allegedly responded, "I'm not going to be shot at by some fucking idiot." (*Id.* at #65). Spoljaric handcuffed Freeman and escorted him out of the home to his cruiser. (*Id.*). Along the way, Freeman alleges Spoljaric intentionally pushed his head into the door jamb. (*Id.*).

As noted, the Court has reviewed video footage of this altercation recorded by a camera inside Freeman's home and pointed at the front door. The video largely depicts many of these events as so far described. However, Freeman leaves the frame directly before being tased. Therefore, the video does not show Freeman being tased or the events surrounding him being handcuffed.

5

Freeman next alleges Spoljaric searched his pockets, recovering various items including his cell phone. Of some note, Freeman's original Complaint does not allege Spoljaric took Freeman's phone outside the house but instead took his phone later from inside the house. (*Compare id.* at #65, *with* Doc. 1, #6). Either way, Freeman alleges Spoljaric took his phone.

As Spoljaric placed Freeman in his cruiser, Freeman complained he could not breathe or see and was in pain. (Doc. 11, #65). So Spoljaric contacted local emergency medical services. (*Id.*). Later, Spoljaric re-entered Freeman's residence along with another officer. (*Id.*). (It is unclear when this second officer arrived.) While in the home, Spoljaric discussed the events with the second officer, stating "Well, then he started recording, like he always does … and then he starts, I don't know, shooting in the air." (*Id.*). Spoljaric seized Freeman's firearm from the table and took several pictures before leaving. (*Id.* at #66).

From the video, the Court notes that while talking with the other officer, Spoljaric glanced at the surveillance camera pointed at him. Immediately after noticing the camera, Spoljaric states "[Freeman] wouldn't … then we start wrestling over here … he wouldn't comply, wouldn't turn around, wouldn't stand up. And I'm trying to get him out and he's still wrestling with me." This, of course, provides at least some evidence Freeman resisted arrest while out of frame. That said, as Defendants have moved to dismiss, the Court must review all evidence in the light most favorable to Freeman, and the video does not depict the "wrestling" Spoljaric describes.

Medics transported Freeman to a local emergency room. (*Id.* at #66). At the E.R., staff removed the taser prongs and poured milk in Freeman's eyes. (*Id.*). Although Freeman alleges he complained of difficulty seeing and breathing, medical staff discharged him back into Spoljaric's custody without performing more tests or providing additional treatment. (*Id.*). Spoljaric then took Freeman to jail, where Freeman allegedly reported "chest pains and lightheadedness" to jail staff. (*Id.* at #66). After two days of similar complaints, jail staff transported Freeman back to the hospital, where he stayed for two days. (*Id.* at #66–67). There, medical staff allegedly informed Freeman he had suffered a heart attack, "a broken rib, and numerous contusion[s] and cuts" during the incident. (*Id.* at #67).

Freeman was charged with four counts. (*Id.*). Two were felonies: Retaliation under Ohio Revised Code § 2921.05(A) and Obstructing Official Business under Ohio Revised Code § 2921(A) & (B). Two were misdemeanors: Aggravated Menacing under Ohio Revised Code § 2903.21(A) & (B) and Resisting Arrest under Ohio Revised Code § 2921.33(A) & (D).[2]

Freeman alleges he then made multiple requests to have his firearm and cell phone returned to him. (*Id.*). He claims to have sent a formal demand letter to the Lawrence County Sheriff's Office to this effect on April 4, 2022. (*Id.* at #79–80). Freeman further alleges a representative of the Lawrence County Sheriff's Office responded that "they are not in possession" of his property. (*Id.* at #67).

---

[2] When Freeman filed his Amended Complaint on June 6, 2022, he reported these charges remained pending. (*Id.* at #67).

7

## B.     Procedural History

Freeman sued Spoljaric in his individual and official capacities, along with Lawrence County as Spoljaric's employer. (Doc. 1, #1). The Complaint contained many of the same factual allegations already described. However, as noted above, his original Complaint alleged Spoljaric took his cell phone from the table in the home—an allegation Freeman has since abandoned in favor of a new version. (*Id.* at #6). Freeman asserts six causes of action under Section 1983: unreasonable seizure, excessive use of force, unreasonable search, violation of due process for the deprivation of property, "chilling of 1st Amendment," and a *Monell* claim against Lawrence County for a failure to properly train and supervise.[3] (*Id.* at #7–11). For relief, he demanded a declaration his rights had been violated and damages. (*Id.* at #13).

Defendants moved to dismiss for failure to state a claim. (Doc. 7). Before the Court could rule on that matter, though, Freeman filed an Amended Complaint. (Doc. 11). Freeman's Amended Complaint maintained many of the allegations from the original Complaint but changed his story about how Spoljaric acquired the cell phone, claiming Spoljaric took it directly from Freeman. (*Id.* at #65).

Freeman also slightly changed his causes of action. His Amended Complaint, still proceeding under § 1983, alleges: excessive force, unreasonable search, violation of due process for the deprivation of property, "right to be protected and receive necessary care while in custody," and "chilling of 1st Amendment" claims, as well as

---

[3] The Complaint claims to have seven causes of action, but Freeman lists only six.

a *Monell* claim against Lawrence County for a failure to train and supervise. (*Id.* at #68–72).

Defendants moved to strike Freeman's Amended Complaint as untimely. (Doc. 13). The Magistrate Judge, though, found the Amended Complaint timely and so issued an Order denying Defendants' Motion to Strike. (Doc. 17, #127). In addition, the Magistrate Judge issued a Report and Recommendation advising the Court to deny Defendants' Motion to Dismiss as moot because it referred to a non-operative complaint. (*Id.*). The Court adopted the recommendation. (12/8/2022 Not. Order).

Defendants renewed their Motion to Dismiss on July 25, 2022. (Doc. 18). Freeman responded, (Doc. 27), and Defendants replied (Doc. 28). The Court addresses each of the parties' arguments below.

Separately, on February 7, 2023, Defendants alerted the Court that Freeman had not responded to two Requests for Admissions sent to him. (Doc. 29). Defendants alleged they sent Freeman a first set of Requests for Admissions the previous June and a "follow-up" reminder that August. (*Id.* at #217). They claim Freeman never responded. (*Id.*). Defendants also claim they sent Freeman a second set of Requests for Admissions in January 2023 with no reply. (*Id.*). As a result, Defendants moved this Court to order those queries as fully admitted under Federal Rule of Civil Procedure 36(a)(3). (*Id.* at #216). Even as to that Motion, Freeman has never responded.

Finally, as the Court prepared to rule on Defendants' Motion to Dismiss, it took notice that Freeman's Amended Complaint alleged his state criminal proceedings

remained pending as of that time. Accordingly, on February 8, 2023, the Court issued the following:

> Based on the allegations in the Amended Complaint, the Court takes notice that the issues raised in this case may relate to pending state court criminal proceedings. This in turn may raise abstention questions under *Younger v. Harris*, 401 U.S. 37 (1971). Therefore, the Court orders Freeman and Defendants to each file briefing not to exceed 10 pages as to whether *Younger* requires abstention in this action, and if so, as to which claims.

(2/8/2023 Not. Order).

Both parties responded. (Docs. 32 & 33). According to Defendants, Freeman had since pled guilty to disorderly conduct, a minor misdemeanor and has been sentenced. (Doc. 32, #277). However, Freeman appealed that judgment, and that appeal (apparently) remains pending. (*Id.*). Nonetheless, both parties agreed that Freeman's final judgment in the trial court mooted any need for abstention under *Younger*. (*Id.* at #278; Doc. 33, #290). Thus all of the matters set forth above are ripe.

## STANDARD OF REVIEW

Defendants move to dismiss Freeman's Amended Complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In resolving that motion, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (internal quotation marks omitted). That is so, however, only as to well-pled factual allegations. The Court need not accept "'naked assertions' devoid of 'further factual enhancement'" or mere "formulaic recitation of the elements of a cause of

10

action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (brackets omitted) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

At the pleadings stage, a complaint must "state[] a claim for relief that is plausible, when measured against the elements" of a claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)). "To survive a motion to dismiss, in other words, [Freeman] must make sufficient factual allegations that, taken as true, raise the likelihood of a legal claim that is more than possible, but indeed plausible." *Id.* (citations omitted).

Freeman's federal claims against Spoljaric also raise issues of qualified immunity. Qualified immunity is an affirmative defense, so a party may forfeit it if not invoked. *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014). But Spoljaric has asserted it here. (Doc. 18, #141–42.) So Freeman must plausibly allege both that Spoljaric violated his constitutional rights and that the right had been sufficiently "clearly established" so that "a reasonable person in [Spoljaric's position] would have known." *Brown v. Lewis*, 779 F.3d 401, 411 (6th Cir. 2015) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)); *Siefert v. Hamilton County*, 951 F.3d 753, 761 (6th Cir. 2020) (noting a complaint need only plausibly allege the elements to survive qualified immunity). Thus, where he invokes qualified immunity, Spoljaric can prevail by showing either that there was no constitutional violation, or that any violation did not involve a clearly established constitutional right. *Id.* (citing *Sample v. Bailey*, 409 F.3d 689, 696 (6th Cir. 2005)). And the Court is free to take those two

questions—the existence of the constitutional right, or whether it was clearly established—in either order. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

## LAW AND ANALYSIS

Defendants have moved to dismiss Freeman's six claims. For the reasons discussed, Freeman has not plausibly allegedly many of his claims. However, Freeman has plausibly alleged an excessive use of force claim, an unreasonable search claim, and a First Amendment retaliation claim, all against Spoljaric in his individual capacity. Separately, Spoljaric has failed to establish (or as to some claims even plead) that he is entitled to qualified immunity as to these three claims.

## A.   Defendants Waived Abstention Under *Younger v. Harris*.

Freeman's Amended Complaint alleged he had been charged with four counts in state criminal court. (Doc. 11, #67). And his Amended Complaint attested these charges remained pending at that time. (*Id.*). The Court, concerned about the potential of interfering with ongoing state court criminal proceedings, ordered the parties to submit "briefing as to whether [*Younger v. Harris*] requires abstention in this action." (2/8/2023 Not. Ord. (citing *Younger v. Harris*, 401 U.S. 37 (1971)). Both parties did. (Docs. 32 & 33).

In their response, Defendants argued no abstention was necessary because "there are no on-going state proceedings that warrant this Court's abstention." (Doc. 32, #278). Defendants believe that, despite Freeman actively appealing his conviction, the trial court's final judgment ended the proceedings for purposes of

*Younger*. (*Id*. at #275–76). As for Freeman, he likewise agreed the doctrine does not warrant abstention while he prosecutes his appeal. (Doc. 33, #290–91).

The Sixth Circuit has yet to say at what point a state proceeding is no longer "ongoing" for *Younger* purposes. But the Court need not answer that question, as Defendants have waived abstention. *O'Neill v. Coughlan*, 511 F.3d 638, 641 (6th Cir. 2008). After the Court raised the issue, Defendants concluded *Younger* does not apply and urged the Court rule on their Motion to Dismiss. That amounts to express wavier. *See id.*; *Cremeans v. Taczak*, No. 2:19-cv-2703, 2019 WL 5420256, at *7 (S.D. Ohio Oct. 23, 2019). So even if Freeman's state criminal proceedings are "ongoing" while he appeals, that is irrelevant. Accordingly, the Court will ignore any potential *Younger* issues and proceed to rule on Defendants' Motion to Dismiss.

## B. Freeman Has Not Plausibly Alleged A Due Process Property Deprivation Claim, A *Monell* Claim, Or An Inadequate Medical Care Claim.

The Court can quickly dispose of Freeman's due process, *Monell*, and medical care claims. Start with his Fourteenth Amendment due process property deprivation claim. Freeman alleges Spoljaric took his cell phone. (Doc. 11, #69–70). To Freeman, Defendants deprived him of his property without due process. (*Id*.). And Defendants have not returned his phone despite a letter demanding as much. (*Id*. at #79–80).

One problem though. To state a due process deprivation-of-property claim, a "plaintiff must plead and prove that state remedies for redressing the wrong are inadequate." *Vicory v. Walton*, 721 F.2d 1062, 1065–66 (6th Cir. 1983). "If satisfactory state procedures are provided in a procedural due process case, then no constitutional

13

deprivation has occurred despite the injury." *Jefferson v. Jefferson Cnty. Pub. Sch. Sys.*, 360 F.3d 583, 587–88 (6th Cir. 2004). If a plaintiff does not plead the inadequacy of state procedures, dismissal is appropriate. *Gibbs v. Hopkins*, 10 F.3d 373, 377–78 (6th Cir. 1993).

Here, Freeman did not plead the inadequacy of state procedures. Nothing in the Amended Complaint or his Response discusses state remedies. Absent that, Freeman's due process claim insufficiently pled. *See Vicory*, 721 F.2d at 1065–66.

Turn to the *Monell* claims. There are many. To start, Freeman presents one *Monell* claim explicitly naming Defendant Lawrence County. (Doc. 11, #72–73). There, Freeman alleges Lawrence County "bears liability for the lack of training and supervision of its employees." (*Id.*). But that's not all. In reality, each of Freeman's official capacity claims against Spoljaric also amounts to a *Monell* claim against the Lawrence County Sheriff's Office. *United Food & Com. Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 752 (6th Cir. 2004).

All of these *Monell* claims fail for the same reason. A *Monell* claimant must demonstrate "that the municipality had a 'policy or custom' that caused the violation of his rights." *Wright v. City of Euclid*, 962 F.3d 852, 879–80 (6th Cir. 2020) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)). *Monell* liability cannot proceed under a *respondeat superior* theory based on the unlawful acts of an employee. *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell*, 436 U.S. at 694). Thus, Freeman's allegations must implicate the municipality directly, here Lawrence County or the Lawrence County Sheriff's Office.

14

*Doe v. Claiborne County*, 103 F.3d 495, 507–08 (6th Cir. 1996). And to do that, Freeman must plausibly allege one or more of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance [of] or acquiescence [to] federal rights violations." *Burgess*, 735 F.3d at 478. Freeman alleges none of these. He offers only are bare legal conclusions which the Court properly disregards. *See Iqbal*, 556 U.S. at 678. That is not enough.

Finally, Freeman's inadequate medical care claim. Freeman claims he "was denied his necessary medications, requests for water, and denied [a] proper medical assessment after suffering a heart attack subsequent to excessive electrocution by taser for approximately 2 days."[4] (Doc. 11, #71). He concludes "Defendant Lawrence County through its jail employees violated Plaintiff[']s rights relating to the 14th Amendment and did so with deliberate indifference." (*Id.*). But Freeman only actually accuses Lawrence County, not Spoljaric (who was not at the jail) or any jail employee, of neglecting his care—so this amounts to yet another *Monell* claim. For the same reasons the above *Monell* claim fails, this claim fails too.

## C. Freeman Has Plausibly Alleged His Excessive Use Of Force, Unreasonable Search, And First Amendment Retaliation Claims.

Freeman finds more success in his other claims. He has plausibly alleged his excessive use of force claim, his unreasonable search claim, and his First Amendment

---

[4] While the allegation is ambiguous, the Court assumes that Freeman is alleging that the medical assessment was delayed by two days, not that the tasing lasted for two days.

retaliation claim, all against Spoljaric in his individual capacity. Notably, Spoljaric has asserted qualified immunity *only* as to Freeman's excessive use of force claim. As to that claim, at least at the motion to dismiss stage, the Court concludes that Spoljaric is not entitled to qualified immunity. Of course, Spoljaric may reallege this defense if more facts come to light.

### 1. Freeman Has Plausibly Alleged A Claim For The Excessive Use Of Force.

Spoljaric argues he is entitled to qualified immunity as to Freeman's excessive use of force claim. (Doc. 18, #141–44). As a result, the Court must determine both whether Spoljaric violated Freeman's constitutional rights and whether the right was "clearly established." *Brown*, 779 F.3d at 411.

Begin with the constitutional violation. The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. This includes prohibiting the use of excessive force in effectuating an arrest. *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015). The Court evaluates "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)) (internal quotation marks omitted). In other words, an officer's subjective beliefs are irrelevant. *See Est. of Hill by Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017).

Beyond that, the force is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth

16

Amendment interests against the countervailing governmental interests at stake."
*Goodwin,* 781 F.3d at 321. The Court also must remain cognizant that "[p]olice officers routinely face 'tense, uncertain, and rapidly evolving' situations that force split-second judgments about the degree of force required." *Reich v. City of Elizabethtown*, 945 F.3d 968, 978 (6th Cir. 2019) (quoting *Graham*, 490 U.S. at 397).

Against this backdrop, three factors act guide the excessive force inquiry: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 687 (6th Cir. 2006). That said, the analysis ultimately boils down to the totality of the circumstances as would be perceived by a reasonable officer in the moment. *Goodwin,* 781 F.3d at 321.

An important dividing line exists between active and passive resistance. *Id.* at 323. Active resistance can be recognized by some combination of "volatility, hostility, and danger in a way that increases with the passage of time." *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013). Active resistance, like physically refusing to be handcuffed, "verbal hostility," or "deliberate acts of defiance," justifies officers tasing a suspect or applying another form of equivalent or lesser force. *Goodwin,* 781 F.3d at 323; *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012). But passive resistance will not justify the same response. *Goodwin,* 781 F.3d at 323. Passive resistance occurs when a suspect does not comply with an officer's orders, but the noncompliance is "not paired with any signs of verbal

17

hostility or physical resistance." *Eldridge*, 533 F. App'x at 535. Even repeated refusals to comply will not, by themselves, convert passive into active resistance. *See id.*

Freeman, in effect, alleges four distinct applications of excessive force: (1) the pepper spray; (2) the taser; (3) the punching/kicking; and (4) the head-in-the-door-jamb injury. (Doc. 11, #64–65). The Court will start by discussing the similarities among all four before addressing each individually. At the outset, the Court emphasizes that it does not consider whether Spoljaric had probable cause to arrest Freeman—only whether Spoljaric used excessive force in effectuating that arrest.[5]

First, the similarities—beginning with the severity of the offense. Freeman allegedly committed a relatively severe underlying crime: firing a gun to intimidate Spoljaric.[6] The Court will not downplay that offense. That said, there is no evidence (at least for now) a reasonable officer in the same situation would have believed Freeman fired his gun *at* them. After all, Freeman was charged with Retaliation and Obstructing Official Business, not Attempted Murder.

Also similar throughout, Freeman's allegations tend to show he offered mostly passive, not active, resistance. Freeman's Amended Complaint contains no

---

[5] Freeman's Response to Defendants' Motion to Dismiss seemingly argues Spoljaric performed an unlawful arrest because he lacked probable cause Freeman had committed a crime. Freeman did not bring a cause of action for unlawful arrest though. Thus, whether Spoljaric had probable cause is irrelevant.

[6] Courts in this circuit are divided on whether this is considered a serious crime. *Compare Trimble v. Parisek*, No. 11-12932, 2013 WL 5449571, at *4 (E.D. Mich. Sept. 30, 2013) ("[T]he crime at issue was serious—Plaintiff shot a gun into the air. . . ."), *with Adams v. Village of Beaver*, No. 2:08-cv-677, 2011 WL 1303273, at *7 (S.D. Ohio Mar. 31, 2011) ("[T]he nature of the alleged crime (discharging a firearm from a porch), without more, arguably was not severe enough to warrant the use of any force."). This Court stands somewhere in the middle, agreeing that firing a gun into the air is serious but also not per se warranting the immediate application of force.

allegations of physical resistance, verbal hostility, or deliberate acts of defiance. Instead, Freeman (1) defied Spoljaric's order to come away from the house before (2) stepping backwards inside the house (3) with his hands raised while (4) stating he had done nothing wrong. (Doc. 11, #64). That is passive resistance. *See Goodwin*, 781 F.3d at 323; *Eldridge*, 533 F. App'x at 535 ("[N]oncompliance alone does not indicate active resistance; there must be something more."). And while, as discussed below, the situation did become more volatile after Spoljaric pepper sprayed Freeman, there are no facts (yet) to show Freeman planned to harm Spoljaric or himself. Granted, the Court has not yet heard Spoljaric's side of the events and bases that conclusion on Freeman's allegations and the surveillance video, but that is what the Court has to go on at this juncture.

In many ways, this case looks similar to *Goodwin v. City of Painesville*, where a suspect spoke with an officer at his doorway before defying police orders by refusing to come outside. 781 F.3d at 323. There, the court found the suspect only passively resisted by retreating into their own home against police orders. *Id.* Here, Freeman's conduct is largely the same, retreating into and remaining within his own home against Spoljaric's orders. Therefore, based on the allegations to date, the Court concludes Freeman offered passive resistance.

Against that backdrop, the Court now examines each of the four described applications of force. Start with the pepper spray. Freeman claims he stood a few feet outside his front door when Spoljaric began yelling at him. (Doc. 11, #64). At this point, Spoljaric had recently heard Freeman fire a gun five times, but Spoljaric could

not see the weapon. (*Id.*). As Spoljaric approached, Freeman raised his hands into the air and stepped backwards into his home. (*Id.*). Spoljaric ordered Freeman to come outside while Spoljaric unholstered his pepper spray. (*Id.*). After Freeman did not move, Spoljaric deployed pepper spray. (*Id.*). The video confirms this.

"An officer has used excessive force when he pepper sprays a suspect who has not been told she is under arrest and is not resisting arrest." *Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009); *see also Atkins v. Township of Flint*, 94 F. App'x 342, 349 (6th Cir. 2004) (finding use of pepper spray unreasonable where plaintiff "was not told that he was under arrest, … did not start the physical altercation, and … there was no reason not to tell him he was under arrest"). Tasers are treated similarly.[7] *See Goodwin*, 781 F.3d at 326; *Kent v. Oakland County*, 810 F.3d 384, 390–92 (6th Cir. 2016). Thus, the officer should give "a statement that [the suspect] was under arrest or an order to get on the ground or something similar" to make it "objectively apparent" to the suspect they were under arrest before the suspect's resistance warrants pepper spray or a taser. *Goodwin*, 781 F.3d at 326; *see also Cockrell v. City of Cincinnati*, 468 F. App'x 491, 498 (6th Cir. 2012).

"[T]here is a very limited class of circumstances when the use of pepper spray is proper, including where a detainee is unsecured, acting violently, and posing a

---

[7] The Sixth Circuit previously quoted a police manual suggesting the use of a tasers falls somewhere above pepper spray along the "force continuum" officers employ. *Griffith v. Coburn*, 473 F.3d 650, 657 (6th Cir. 2007). Other circuits suggest the two are relatively co-equal. *Abbott v. Sangamon County*, 705 F.3d 706, 726 (7th Cir. 2013); *Brown v. City of Golden Valley*, 574 F.3d 491, 500 n.6 (8th Cir. 2009). Still, the two have differing functions, benefits and drawbacks. *See* Eugene Volokh, *Nonlethal Self-Defense, (Almost Entirely) Nonlethal Weapons, and the Rights to Keep and Bear Arms and Defend Life*, 62 STAN. L. REV. 199, 204–07 (2009).

threat to himself or others." *Cabaniss v. City of Riverside*, 231 F. App'x 407, 413 (6th Cir. 2007); *see also Hagans*, 695 F.3d at 510–11 (permitting taser to subdue an arrestee "out of control" who "continued forcefully to resist arrest"); *Kent*, 810 F.3d at 391 (noting a taser is permissible where the arrestee is a "physical and immediate safety threat"); *Gaddis v. Redford Township*, 364 F.3d 763, 774 (6th Cir. 2004) (permitting pepper spray to stop an armed arrestee from fleeing); *Monday v. Oullette*, 118 F.3d 1099 (6th Cir. 1997) (permitting pepper spray to subdue an arrestee from harming themselves).

Although admittedly a close case, the Court concludes that Freeman has plausibly alleged Spoljaric used excessive force in deploying pepper spray. When Spoljaric did so, Freeman faced Spoljaric, had not made any sudden movements, and had his arms raised into the air. Although Freeman had not complied with Spoljaric's order to come outside, Spoljaric did not tell Freeman he was under arrest. And critically, Spoljaric had not ordered Freeman to get on the ground or something similar that would have made it "objectively apparent" to Freeman that he was under arrest. Indeed, recall that Freeman had summoned Spoljaric to his property in the first place, perhaps making it even less likely for Freeman to conclude that Spoljaric was arresting him.

True enough, Spoljaric had heard Freeman discharge a firearm not long beforehand. Spoljaric claims his use of pepper spray was justified because he did not know where Freeman had placed the gun, and a reasonable officer could fear Freeman might retrieve the gun from inside the house. (*Id.* at #143–44). And in

21

fairness to Spoljaric, an officer does not use excessive force by deploying non-lethal force to subdue an "armed and volatile suspect." *Bing v. City of Whitehall*, 456 F.3d 555, 569–70 (6th Cir. 2006); *Ewolski v. City of Brunswick*, 287 F.3d 492, 508 (6th Cir. 2002).

That said, despite his noncompliance, Freeman gave no indication he planned to harm Spoljaric as he stood in the doorway. Empty hands raised and standing still, Freeman can hardly have been considered an "armed and volatile suspect." And Spoljaric had, again, not told Freeman that he was under arrest. *See Goodwin*, 781 F.3d at 326. Based on the totality of the circumstances (as alleged by Freeman), Freeman has plausibly alleged Spoljaric employed excessive force by pepper spraying him. Again, additional facts may change the Court's view on that, but that is a question for another day.

Turn now to the taser, which is better for Spoljaric in some ways and worse in others. After Spoljaric deployed pepper spray, Freeman retreated farther within his home and turned his back to Spoljaric. (Doc. 11, #64). At this point, the situation became more volatile. Although Freeman kept his arms in the air, he now faced away from Spoljaric. (*Id.*). Again, the video shows this. In this position, Freeman could have more easily reached for a weapon without Spoljaric seeing. Moreover, Freeman can no longer have doubted Spoljaric intended to arrest him. Yet Freeman nonetheless continued to move away from Spoljaric. Thus, the situation developed in a way that

heightened the danger for Spoljaric and made clear to Freeman he could no longer offer resistance. So Spoljaric did not use excessive force by tasing Freeman.[8]

But how long Spoljaric tased Freeman is a different question. Freeman claims Spoljaric "continued the intermittent taser electrocution of [Freeman] over a 30 second period of time." (*Id.*). While the initial tasing was constitutionally acceptable, 30 seconds of "intermittent taser electrocution" could be excessive based on the allegations here. *See Goodwin*, 781 F.3d at 324. And even if Freeman resisted before, the Amended Complaint does not allege, and the video does not show, that Freeman continued to resist during those 30 seconds.[9]

Again, *Goodwin* offers guidance. There, the suspect was tased for a total of 26 seconds—well past the point of resistance. *Id.* at 318. The court held "previously-resisting suspects have a constitutional right to be free of a gratuitous application of a Taser once they have stopped all resistance." *Id.* at 324. Here, Freeman alleges an even longer overall period of electrocution. True, "intermittent" could mean many things. Perhaps Spoljaric only actively electrocuted Freeman for 10 seconds spread out over 30. Perhaps longer. And indeed, that Freeman allegedly suffered a heart attack tends to support an inference he received an extended electrocution. (Doc. 11,

---

[8] Granted, it is unclear whether Freeman had full control of his body at this point. He alleges he "stumbled" backwards, presumably not as an intentional act. (Doc. 11, #64). Still, Freeman's turning away and continued retreat into his home increased the danger for a reasonable officer in Spoljaric's position. Based on the totality-of-the-circumstances, a reasonable officer could believe employing a taser necessary.

[9] As described above, the surveillance video later shows Spoljaric informing a fellow officer that Freeman continued to resist. It is unclear if Spoljaric means Freeman resisted while being tased, in the handcuffing process, or both. At the pleading stage, though, the Court cannot rely on Spoljaric's unsworn statement.

#67). But for now, the Court simply concludes that 30 seconds of "intermittent" electrocution plausibly extended beyond (maybe well beyond) Freeman's resistance. Accordingly, Freeman has plausibly alleged Spoljaric used excessive force in tasing him for the amount of time that he allegedly did.

The punching and kneeing allegations follow a similar path. After being pepper sprayed and tased, Freeman claims Spoljaric "punched him several times to his head and kneed [Freeman] several times in the ribs and his back." (Doc. 11, #65). Later, medical personnel allegedly told Freeman he suffered "a broken rib" and "numerous contusions and cuts" from the altercation. (*Id.* at #67). The video does not show this, meaning the Court is left with Freeman's allegations from the Amended Complaint alone.

Once more, Freeman has plausibly alleged Spoljaric employed excessive force. At least from the Amended Complaint, there is no evidence Freeman continued to resist following the tasing. If that is so, Spoljaric's alleged attack cannot be justified as an attempt to subdue a dangerous or volatile suspect. *See Goodwin*, 781 F.3d at 324. And Freeman's resulting physical injuries further evidence potentially excessive force. From the allegations to date, it appears Freeman's physical injuries, such as his broken rib, occurred at this juncture—i.e., it seems unlikely the pepper spray, taser, or the impact with the door-jamb are to blame. But following 30 seconds of "intermittent" electrocution, it is unclear why a reasonable officer in Spoljaric's position would need to apply force sufficient to break Freeman's rib. Once again, the Court has yet to hear Spoljaric's side (beyond his statement in the video). But at this

24

stage Freeman has plausibly alleged Spoljaric's "punching" and "kneeing" constituted excessive force.

Finally, the head-into-the-door-jamb allegation. After allegedly punching and kneeing Freeman, Spoljaric handcuffed him and took him to his cruiser. (Doc. 11, #59). On the way, Freeman claims Spoljaric "forcefully pushed Freeman's face into the door-jam as they exited the home." (*Id.*). The video depicts Freeman's head running into the door jamb. Here again, Freeman plausibly alleges excessive force, particularly to the extent Spoljaric (allegedly) intentionally injured Freeman. *See Coley v. Lucas County*, 799 F.3d 530, 540–51 (6th Cir. 2015) (noting violent physical force applied out of frustration and anger without penological justification constitutes excessive force).

In short, Freeman has plausibly alleged Spoljaric violated his constitutional rights through four separate applications of excessive force. That leaves the second prong of qualified immunity—whether the right was clearly established.

Qualified immunity presents a fact-sensitive analysis, making it generally a "bad fit" for a motion to dismiss based on the pleadings. *Siefert*, 951 F.3d at 761; *see also Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring in part) (recognizing dismissal based on the pleadings "is a mismatch for [qualified] immunity and almost always a bad ground of dismissal"). "Without more than the complaint to go on, the court 'cannot fairly tell whether a case is "obvious" or "squarely governed" by precedent,' making qualified immunity inappropriate." *Siefert*, 951 F.3d at 761 (quoting *Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019);

*Moderwell v. Cuyahoga County*, 997 F.3d 653, 661 (6th Cir. 2021). Instead, courts typically recognize that summary judgment, not a Rule 12 motion, presents the earliest point when dismissal for qualified immunity is proper. *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015); *Evans–Marshall v. Bd. of Educ. of Tipp City Exempted Village Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring) (recognizing it is "difficult for a defendant to claim qualified immunity on the pleadings before discovery"). To be clear, though, "this is only a 'general preference,' not an absolute one." *Siefert*, 951 F.3d at 761. If plaintiffs present clearly "'insubstantial claims' against government officials," qualified immunity should "be resolved prior to discovery." *Pearson*, 555 U.S. at 231 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987)).

For purposes of Defendants' Motion to Dismiss, Spoljaric has not shown he is entitled to qualified immunity as to Freeman's excessive force claim. Prior to January 22, 2022, the Sixth Circuit clearly established a suspect has a right to not be pepper sprayed unless told or otherwise led to believe they are under arrest. *See Grawey*, 567 F.3d at 311. Further, the Circuit clearly established a suspect has a right not be tased or otherwise intentionally hit/injured after ceasing resistance. *See Goodwin*, 781 F.3d at 324. Given those cases, Spoljaric is not entitled to qualified immunity at this point. That said, with aid of additional facts and further discovery, Spoljaric may re-raise this defense at a later date.

### 2. Freeman Has Plausibly Alleged An Unreasonable Search Claim.[10]

Freeman next alleges Spoljaric "absent any warrant, personal invitation, or exigent circumstances chose to enter into [his] home and make a search and seize of items absent due cause." (Doc. 11, #69). Specifically, Freeman claims Spoljaric entered his home to arrest him and then re-entered his home after the arrest to recover Freeman's firearm and take photos of the scene. (*Id.* at #65–66).

"A police officer's entry into a home without a warrant"—like Spoljaric's here—"is presumptively unconstitutional under the Fourth Amendment." *Barton v. Martin*, 949 F.3d 938, 948 (6th Cir. 2020) (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002)). Indeed, an officer's "physical entry of the home is the chief evil against which [the Amendment] is directed." *Lange v. California*, 141 S. Ct. 2011, 2018 (2021) (quoting *Payton v. New York*, 445 U.S. 573, 585, 587 (1980)); *United States v. Yoon*, 398 F.3d 802, 808 (6th Cir. 2005) (Kennedy, J., concurring) ("The Fourth Amendment … draws a firm line at the entry to one's house such that a police officer may not, in the absence of exigent circumstances or consent, enter a house to arrest or search without first obtaining a warrant.").

Only limited circumstances permit an officer to enter a suspect's home without a warrant or consent. Those include: "(1) when the officers were in hot pursuit of a fleeing suspect; (2) when the suspect represented an immediate threat to the arresting officers and public; (3) when immediate police action was necessary to

---

[10] Freeman's Amended Complaint does not explicitly allege a claim for an unreasonable seizure in violation of the Fourth Amendment. Therefore, the Court does not evaluate these facts for a Fourth Amendment unreasonable seizure claim.

prevent the destruction of vital evidence or thwart the escape of known criminals," along with (4) "when they reasonably believe that a person within is in need of immediate aid." *Causey v. City of Bay City*, 442 F.3d 524, 529 (6th Cir. 2006) (quoting first *Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir. 1992), then *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)). A warrantless entry must be "limited in scope and proportionate to the exigency excusing the warrant requirement." *United States v. Hill*, No. 22-5274, 2023 WL 152474, at *3 (6th Cir. Jan. 11, 2023) (quoting *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1513 (6th Cir. 1988)).

Spoljaric argues he had an exigency to enter the home based on Freeman's possession of a firearm. (Doc. 18, #145). True, officers may enter a home without a warrant to apprehend a "reckless gunman" who poses a "risk of danger to the police or others." *United States v. Johnson*, 106 F. App'x 363, 368 (6th Cir. 2004); *see also Dickerson v. McClellan*, 101 F.3d 1151, 1160 (6th Cir. 1996). But "[e]vidence that firearms are within a residence, by itself, is not sufficient to create an exigency." *Barton,* 949 F.3d at 948 (quoting *United States v. Bates*, 84 F.3d 790, 795 (6th Cir. 1996)). Instead, police must have "information that the suspect was armed and likely to use a weapon or become violent." *Id.* Even in the context of a "shots-fired report," police need "additional evidence of an immediate threat before entering a home without a warrant." *Id.*; *United States v. Bates*, 84 F.3d 790, 795–96 (6th Cir. 1996) (finding no exigent circumstances when a suspect had a firearm in the residence but there was no evidence the suspect may become violent).

28

But another exigency could also apply here—hot pursuit. A suspect's flight into the home cannot shield them from an ongoing felony arrest.[11] *United States v. Santana*, 427 U.S. 38, 42–43 (1976); *Lange*, 141 S. Ct. at 2020 (cabining the justification to felonies). Where an officer already has probable cause for a felony arrest and begins that arrest, the suspect's retreat into the home may create a "true hot pursuit" justifying a warrantless entry of the home to complete it. *Santana*, 427 U.S. at 43. In other words, a suspect's "act of retreating into her house" cannot "defeat an arrest that had been set in motion in a public place." *Lange*, 141 S. Ct. at 2019 (cleaned up); *Smith v Stoneburner*, 716 F.3d 926, 931 (6th Cir. 2013) ("The 'pursuit' begins when police start to arrest a suspect in a public place, the suspect flees and the officers give chase."). And this rule applies even when officers first encounter the suspect right at the threshold of his or her front door. *Santana*, 427 U.S. at 40 n.1, 42 (holding an arrestee is in a "public place" without Fourth Amendment protection when they are "exposed to public view, speech, hearing, and touch").

Read expansively, Freeman describes two potentially relevant searches. First, Spoljaric's initial entry to arrest Freeman. (*See* Doc. 11, #64–65). Second, Spoljaric's re-entry after arresting Freeman. (*See id.*).

Begin with the former. After hearing gunfire, Spoljaric next encountered Freeman while Freeman stood outside his home. (Doc. 11, #64). Spoljaric confronted Freeman about firing his gun, and Freeman admitted to doing so. (*See id.*). By that

---

[11] Granted, the rule articulated in *United States v. Santana* is not categorical. *See Lange*, 141 S. Ct. at 2020; *Coffey v. Carroll*, 933 F.3d 577, 586 (6th Cir. 2019). However, the Court believes the circumstances at issue in this case more closely mirror *Santana* than those cases casting doubt on *Santana*.

point, Spoljaric arguably had formed probable cause to arrest Freeman for felony Retaliation under Ohio Revised Code § 2921.05(A).[12] As Spoljaric approached him, Freeman retreated into his home. (Doc. 11, #64). Spoljaric ordered Freeman outside, and Freeman refused. (*Id.* at #64–65). Spoljaric then pepper sprayed into Freeman's house while still standing outside. (*Id.* at #65). Afterwards, Spoljaric himself physically entered. (*Id.* at #65).

From these allegations, exigent circumstances permitted Spoljaric to enter Freeman's home without a warrant. Spoljaric formed probable cause to arrest Freeman for a felony and began the arresting process while Freeman stood *outside* his home in a place where he had no reasonable expectation of privacy. *Santana*, 427 U.S. at 42. Thus, the felony arrest was "set in motion in a public place." *Lange*, 141 S. Ct. at 2019. Freeman's retreat into his home created a "hot pursuit," meaning Spoljaric lawfully entered the home to complete that arrest.

For his part, Freeman argues Spoljaric misplaces reliance on *Dickerson*, which held the "presence of a weapon creates exigent circumstances" where police had information the "suspect was armed and likely to use the weapon or become violent." 101 F.3d at 1160. Freeman claims he posed no threat to Spoljaric, meaning no exigency existed. (Doc. 27, #196–97). But this misses the point. A *different* exigency permitted Spoljaric to enter Freeman's house at that time—the "hot pursuit" created by Freeman's retreat into his home.

---

[12] The Court takes no position whether Freeman indeed violated this provision, only that Spoljaric likely had probable cause to effectuate an arrest.

That leaves Spoljaric's re-entry. And there, the situation is different. Based on the allegations in the Amended Complaint, no justification existed for Spoljaric to re-enter Freeman's home following his arrest. After subduing and securing Freeman—ending the "hot pursuit" exigency—Spoljaric no longer had cause to enter the home without a warrant. *See United States v. Mallory*, 765 F.3d 373, 388 (3d Cir. 2014) ("[O]nce the officers had secured the premises and apprehended Mallory, the exigencies of the moment abated and the warrant requirement reattached.").

Spoljaric responds exigent circumstances existed from the "risk of danger to the police or others." (Doc. 18, #144–45). He points to circumstances where the Sixth Circuit has blessed warrantless entries after "officers observed a man discharge a firearm on his porch and then run into the house with the gun when he became aware of the officers' presence." (*Id.* at #145 (quoting *Modrell v. Hayden*, 636 F.Supp.2d 545, 553 (W.D. Ky. 2009)[13]).

Spoljaric's problem, though, is that these cases concerned an officer's efforts to apprehend that suspect. *See Johnson*, 106 F. App'x at 367 ("[T]his case involves the seizure of evidence found during a search for an armed suspect in the home into which he had fled after committing a crime."). When Spoljaric re-entered Freeman's home, it contained no suspect. Spoljaric already had arrested Freeman. So Spoljaric needed a warrant (or a new exigency) to cross the "firm line at the entry to [Freeman's] house." *Yoon*, 398 F.3d at 808 (Kennedy, J., concurring).

---

[13] *Modrell v. Hayden* is in turn referencing the Sixth Circuit case *United States v. Johnson*, 106 F. App'x 363 (6th Cir. 2004).

31

Also of note, Spoljaric has not defended his warrantless re-entry as necessary to preserve evidence. And even if he had, such an argument lacks support at this time. Nothing in the Amended Complaint or video supports any notion an accomplice planned to remove evidence. *See Hill*, 2023 WL 152474, at *2 (recognizing this exigency requires a "show[ing] that the officers had 'a reasonable belief that third parties [were] inside' and that 'loss or destruction of evidence [was] imminent.'") (quoting *United States v. Straughter*, 950 F.2d 1223, 1230 (6th Cir. 1991))).

In sum, even though Spoljaric's first entry lawfully occurred pursuant to an exigent circumstance, his re-entry did not. Freeman has plausibly alleged Spoljaric's warrantless re-entry into Freeman's home violated his Fourth Amendment rights. And of course, the Court need not consider whether this constitutional right was clearly established because Spoljaric did not assert qualified immunity. *Summe*, 604 F.3d at 269.

### 3. Freeman Has Plausibly Alleged A Claim For First Amendment Retaliation.

Last, Freeman's First Amendment claim. Although Freeman labels this claim "chilling of 1st Amendment," the Court, and Defendants for that matter, view this as a First Amendment retaliation claim.

Based on the Amended Complaint, Freeman alleges he used his cell phone's camera to record Spoljaric. (Doc. 11, #62–63). He began recording after Spoljaric "refused to take" Freeman's police report about Sara Woods's alleged theft. (*Id.*). Freeman recorded for about 15 seconds before re-entering his home. (*Id.* at #63). Following Freeman's arrest, Spoljaric allegedly removed and seized Freeman's cell

phone from his pocket. (*Id.* at #65). Later on, Spoljaric, describing the events to a fellow peace officer, explained "[w]ell, then [Freeman] started recording, like he always does." (*Id.*). As of the Amended Complaint's filing, Freeman alleges he has not received his cell phone back despite numerous requests. (*Id.* at #68). Moreover, the Lawrence County Sheriff's Officer has since informed Freeman "they are not in possession of" his cell phone. (*Id.*). From these allegations, the Court concludes Freeman has stated a plausible claim for First Amendment retaliation.

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected activities. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (citing *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). The claim has three elements:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Maben v. Thelen*, 887 F.3d 252, 264 (6th Cir. 2018) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)). "Although the elements of a First Amendment retaliation claim remain constant, the underlying concepts that they signify will vary with the setting—whether activity is 'protected' or an action is 'adverse' will depend on context." *Thaddeus-X*, 175 F.3d at 388

The Court starts in a somewhat difficult position. Although Freeman pleads a First Amendment retaliation claim in his Amended Complaint (Doc. 11, #71–72), he failed to rebut Defendants' arguments against it in their Motion to Dismiss. To Defendants, that ends matters. (Doc. 28, #211). In support, they cite *Aaron v.*

*Durrani*, 1:13-cv-202, 2014 WL 996471, at \*5 n.6 (S.D. Ohio Mar. 13, 2014), to demonstrate Freeman abandoned this claim by not responding. (Doc. 28, #211).

To Defendants' credit, courts can and often do find parties concede arguments to which they do not respond. *See, e.g.*, *Mekani v. Homecomings Fin., LLC*, 752 F.Supp.2d 785, 790 n.2 (E.D. Mich. 2010). This includes a party's failure to respond to arguments raised in a motion to dismiss. *See Doe v. Bredesen*, 507 F.3d 998, 1007–08 (6th Cir. 2007).

But at the motion to dismiss stage, the "raise or waive" rule is no inexorable diktat.[14] *See Welsh v. Grandville Pub. Schools*, No. 1:20-cv-1207, 2022 WL 708692, at \*7 (W.D. Mich. Jan. 28, 2022) ("Because CW does not meaningfully respond to GPS's arguments regarding the *Monell* claim, the Court *may deem* the claim abandoned." (emphasis added)). "Application of this proposition is … tempered by this Court's discretion and the maxim that 'foolish consistency is reputedly the hobgoblin of little minds.'" *Lipton v. County of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) (quoting *Nat'l Ass'n of Social Workers v. Harwood*, 69 F.3d 622, 627–28 (1st Cir. 1995)). So "[w]hile the Court may consider claims waived when not fully briefed for a motion for judgment on the pleadings, it is not required to do so." *Scruggs v. Meriden Bd. of Educ.*, No. 3:03-cv-2224, 2006 WL 2715388, at \*3 (D. Conn. Sept. 22, 2006).

---

[14] The Sixth Circuit uses more forceful language at summary judgment. "This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013); *see also Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011). This makes sense, as summary judgment must be supported or defeated based on evidence contained within the factual record. At the pleadings stage though, the Court must accept as true the allegations in Freeman's Amended Complaint and ask whether those allegations state a plausible claim for relief.

34

Here, the Court declines to find Freeman abandoned his First Amendment retaliation claim. Where possible, "it is preferable for courts to decide matters on the merits, rather than on procedural grounds." *Romero v. City of Middletown*, No. 1:19-cv-307, 2021 WL 308149, at *4 (S.D. Ohio Jan. 29, 2021). This is all the more true when a party, like Freeman, proceeds pro se. After all, the Court applies "less stringent standards" when assessing a pro se party's pleadings for relief. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). So the Court will assume that Freeman has made sufficient factual allegations to state this claim.

Now to the claim itself. The threshold matter is whether Freeman engaged in a First Amendment protected activity by recording Spoljaric with his cell phone. The United States Supreme Court and the Sixth Circuit have yet to hold the public enjoys a First Amendment right to record police activities in public places. *See Palmer v. Allen*, No. 14-cv-12247, 2016 WL 3405872, at *7 (E.D. Mich. June 21, 2016). In fact, as recently as July 2020, a district court within this Circuit held the right to record police had not been clearly established here. *See Clark v. Stone*, 475 F. Supp. 3d 656, 667 (W.D. Ky. 2020).

But other circuits have reached a different result. Seven circuit courts have held the public has some right to film police. *Glik v. Cunniffe*, 655 F.3d 78, 82–83 (1st Cir. 2011); *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017); *Turner v. Lieutenant Driver*, 848 F.3d 678, 690 (5th Cir. 2017); *ACLU v. Alvarez*, 679 F.3d 583, 595–602 (7th Cir. 2012); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995); *Irizarry v. Yehia*, 38 F.4th 1282, 1293–94 (10th Cir. 2022); *Smith v. City of Cumming*,

35

212 F.3d 1332, 1333 (11th Cir. 2000). To this Court's knowledge, no circuit has squarely held otherwise. *See Turner*, 848 F.3d at 687.

This Court agrees that the First Amendment protects the public's right to film police and other government agents subject to reasonable restrictions. The Founders intended the First Amendment "to protect the free discussion of governmental affairs." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 755 (2011). "Filming the police and other public officials as they perform their official duties acts as 'a watchdog of government activity.'" *Irizarry*, 38 F.4th at 1289 (quoting *Leathers v. Medlock*, 499 U.S. 439, 447 (1991)) ("Filming the police is a form of news gathering."). And "there is an undoubted right to gather news from any source by means within the law." *Glik*, 655 F.3d at 82 (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978)). Taken together, the Court concludes the public has a First Amendment right to photograph and film police activities, "subject to reasonable time, manner and place restrictions." *Smith*, 212 F.3d at 1333.

Applying this principle here, the Court has no trouble concluding Freeman exercised his First Amendment right by filming Spoljaric on Freeman's own property. Indeed, given our Constitution's special reverence for the home and one's property, *see, e.g.*, U.S. Const. amends. IV, V, IVX, the Court struggles to imagine a space more worthy of such protection. It is axiomatic that if one can film police in a "public" place, one can film police on his or her own private property.

True, the right to film police undoubtedly has its limits. Reasonable "time, place, and manner" restrictions certainly apply. *See Glik*, 655 F.3d at 84. Yet none

36

plausibly apply here. Freeman filmed Spoljaric on his own property and without interfering with Spoljaric's efforts to carry out his duties. Indeed, when Freeman filmed Spoljaric with his cell phone, Spoljaric had not yet formed probable cause to arrest him. Based on the allegations to date, Freeman was engaging in First Amendment protected activity when filming Spoljaric.

That leaves the other two elements—adverse action and causal connection. Start with the former. The adverse action test takes "into account context and the individuals whose rights are being retaliated against, but screens out 'trivial actions' that are of 'de minimis' significance." *Moore v. Shelby County*, 369 F. Supp. 3d 802, 807 (E.D. Ky. 2019) (citing *Thaddeus-X*, 175 F.3d at 398). The effect on the exercise of speech "need not be great." *Thaddeus-X*, 175 F.3d at 398. But "although it is a low standard, the plaintiff must still establish some relatively strong action." *Perkins v. Township of Clayton*, 411 F. App'x 810, 814 (6th Cir. 2011) (citing *Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010)). The Court must consider the firmness of an ordinary person, not whether this plaintiff himself or herself was "chilled." *Holzemer*, 621 F.3d at 520.

Here, Freeman has plausibly alleged Spoljaric took an adverse action sufficient to deter someone of ordinary firmness. Taking his phone was fine here; after all, Spoljaric was arresting Freeman. *See Chimel v. California*, 395 U.S. 752, 762–63 (1969). But improperly keeping, losing, or destroying the filming device used to record a government official is an adverse action sufficient to chill the protected activity of a person of ordinary firmness. *Cf. Aguilar v. Moyer*, No. 3:21-cv-5952023, 2023 WL

1070593, at *8 (M.D. Pa. Jan. 26, 2023) ("Mr. Moyer's alleged actions—physically trying to take Aguilar's phone from her—would be sufficient to deter a person of ordinary firmness from exercising her rights."). The whereabouts of the phone appear to be a mystery, but for now, the Court finds it at least plausible that Spoljaric intentionally caused Freeman's phone not to be returned to him.

Finally, the Court considers whether there is a causal connection between Freeman's filming and Spoljaric's adverse action. "Here the subjective motivation of [Spoljaric] is at issue." *Thaddeus-X*, 175 F.3d at 399. This prong "addresses whether the defendants' subjective motivation for taking the adverse action was at least in part to retaliate against the [plaintiff] for engaging in protected conduct." *Hill v. Lappin*, 630 F.3d 468, 475 (6th Cir. 2010). The Court employs a burden shifting framework: "Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant." *Thaddeus-X*, 175 F.3d at 399 (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)).

For purposes of Defendants' Motion to Dismiss, Freeman "must identify in the complaint some evidence (either direct or circumstantial) of retaliatory motive." *White v. Stephens*, No. 13-cv-2173, 2015 WL 6038014, at *7 (W.D. Tenn. Aug. 28, 2015). "[C]onclusory allegations of retaliatory motive unsupported by material facts will not be sufficient to state a ... claim." *Hill*, 630 F.3d at 475.

Freeman provided such circumstantial evidence. After Spoljaric re-entered Freeman's home, cameras recorded Spoljaric complaining to a fellow peace officer

"[w]ell, then he started recording, like he always does." (Doc. 11, #65). This statement provides a plausible inference Spoljaric had become frustrated with Freeman's habit of recording. True, this is a slender reed. But it provides enough to plausibly find Spoljaric disfavored Freeman's tendency to record and desired to punish him for it.

Spoljaric responds in three ways. First, Spoljaric asks the Court to disregard Freeman's allegations involving his cell phone because of inconsistencies between his Complaints. (Doc. 18, #138–40). Freeman's original Complaint alleged Spoljaric took the phone from a counter, while his Amended Complaint alleges Spoljaric took the phone from Freeman's person. Second, Spoljaric argues that Freeman had no right to record police under United States Supreme Court and Sixth Circuit precedent. (*Id.* at #153). Third, Spoljaric claims Freeman's own hypothetical fear of future retaliation does not support his claim. (*Id.* at #153–54). All three are unpersuasive.

First, the Court is unconcerned by any inconsistency about the location of Freeman's phone when Spoljaric seized it. The phone's location when taken does not alter Freeman's core allegation—he never got his phone back. As a result, Spoljaric's out-of-circuit cases that cast doubt on "inconsistent" allegations are unpersuasive. (*Id.* at #138–39). Any inconsistency between the Complaint and the Amended Complaint on this point is at most de minimis. *See Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 372 (D.D.C. 2018) (recognizing "reconcilable small variations between the complaints are acceptable"). And anyway, Freeman's Amended Complaint superseded his original Complaint. *Parry v. Mohawk Motors of Mich. Inc.*, 236 F.3d 299, 306–07 (6th Cir. 2000). Thus, Freeman is not bound by allegations in

his original Complaint after amending the same. *See Kimber Baldwin Designs, LLC v. Silv Commc'ns, Inc.*, 225 F. Supp. 3d 670, 677 (S.D. Ohio 2016) ("Because the complaint was amended, Plaintiff is not bound by the original allegations.").

Second, the Court has already addressed Spoljaric's argument that the Sixth Circuit has yet to recognize the right to film police. For the reasons discussed, the Court holds Freeman had a First Amendment right to film Spoljaric.

Third, the Court agrees that Freeman's personal fear of further retribution does not support his First Amendment retaliation claim. As discussed, the test considers the firmness of an ordinary person, not Freeman himself. *Holzemer*, 621 F.3d at 520. But Freeman *has* alleged a sufficient adverse action—the disappearance of his recording device. And there, the Court holds the unlawful keeping, loss, or destruction of personal property used to record government agents could plausibly deter a person of ordinary firmness.[15]

Finally, the Court again notes that Spoljaric has not invoked qualified immunity as to Freeman's First Amendment retaliation claim. The Court need not consider that defense. *See Summe*, 604 F.3d at 269.

---

[15] Some may find it anomalous that Freeman lacks a due process property deprivation claim because he has not alleged the inadequacy of state procedures, yet he has adequately pled a First Amendment retaliation claim for the same deprivation without a similar showing. Yet Freeman's First Amendment claim is about more than a lost phone. To illustrate, even if Spoljaric compensated Freeman with his phone's market value, Freeman may have permanently lost his recording. And anyway, it is the act of recording itself the First Amendment protects, so monetary compensation for the phone cannot fully account for this constitutional violation.

40

**D.    Freeman Must Show Cause Regarding His Failure To Respond To Defendants' Requests For Admissions.**

On February 7, 2023, Defendants informed the Court that Freeman has not responded to their Requests for Admissions under Federal Rule of Civil Procedure 36(a)(1). (Doc. 29, #217). Defendants claim to have served Freeman a first set of Requests for Admissions on June 28, 2022, and to have sent a "follow-up" on August 11, 2022. (*Id.*). Then, Defendants claim to have sent Freeman a second set of Requests for Admissions on January 5, 2023. (*Id.*). Defendants claim Freeman has never responded to either. (*Id.*). Defendants then moved the Court to deem these two sets of requests as fully admitted under Federal Rule of Civil Procedure 36. (*Id.* at #218).

To date, Freeman has not responded to Defendants' motion under Rule 36. Accordingly, the Court **ORDERS** Freeman **SHOW CAUSE** in writing no later than April 28, 2023, why in light of his failure to respond to Defendants' Requests for Admissions the Court should not deem both sets of Requests for Admissions as fully admitted for purposes of this litigation. Alternatively, Freeman may respond to both of Defendants' Requests for Admissions and notify the Court he has done so no later than April 28, 2023.

**CONCLUSION**

For the above reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss (Doc. 18). Specifically, the Court **GRANTS** Defendants' Motion as to Freeman's due process property deprivation and medical care claims against Spoljaric in his individual capacity, all claims against Spoljaric in his official capacity, and all claims against Lawrence County. The Court

41

**DISMISSES** those claims **WITHOUT PREJUDICE** and **DISMISSES** Lawrence County from this case. However, the Court **DENIES** Defendants' Motion as to Freeman's excessive use of force, unreasonable search, and First Amendment retaliation claims as against Spoljaric in his individual capacity. Those claims may proceed.

Further, the Court **ORDERS** Freeman to **SHOW CAUSE** in writing no later than April 28, 2023, why, given his failure to respond to Defendants' Requests for Admissions, the Court should not deem both sets of Requests for Admissions fully admitted for purposes of this litigation. Alternatively, Freeman may respond to both of Defendants' Requests for Admissions and notify the Court he has done so no later than April 28, 2023. In either event, the Court hereby **NOTIFIES** Freeman that if he continues to fail to respond to Defendants' discovery requests in this matter, the Court may impose sanctions up to and including dismissing his case with prejudice.

**SO ORDERED.**

March 31, 2023
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

42